The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Taylor. As the appealing parties have not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives, the Full Commission affirms the Opinion and Award of the Deputy Commissioner as follows:
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner, after the hearing and in an Pre-Trial Agreement, dated 13 October 1997 as:
 STIPULATIONS
1. At all relevant times, the parties were subject to and bound by the provisions of the Workers Compensation Act.
2. At all relevant times, an employer-employee relationship existed between plaintiff and defendant Sanger Clinic.
3. At all relevant times, defendant-employer was insured for injuries sustained under the Workers Compensation Act by ITT Hartford Insurance Company.
4. The parties stipulated into evidence as Stipulated Exhibit 1, without need for further authentication or verification, documents describing the job duties and requirements of the clinical research position at Nalle Clinic.
5. The parties stipulated into evidence as Stipulated Exhibit 2, without need for further authentication or verification, medical records from the following providers:
• Hunt Clinic of Chiropractic;
• Charlotte Diagnostic Center;
• Charlotte Radiology;
• Charlotte Neurosurgical Associates;
• The Sanger Clinic;
• Carolinas Medical Center;
• Raymond Sweet, M.D.;
• St. George Physical Therapy;
 symbol 183 \f "Symbol" \s 12 Carolina Center for Development and Rehabilitation;
symbol 183 \f "Symbol" \s 12 Charlotte Urology Clinic;
symbol 183 \f "Symbol" \s 12 Presbyterian Hospital;
symbol 183 \f "Symbol" \s 12 George Dornblazer, M.D.;
symbol 183 \f "Symbol" \s 12 Miller Orthopedic Clinic;
symbol 183 \f "Symbol" \s 12 The Rehab Center;
symbol 183 \f "Symbol" \s 12 Arrowood Medical Center;
symbol 183 \f "Symbol" \s 12 MCP Imaging Center;
 symbol 183 \f "Symbol" \s 12 Charlotte Orthopedic Specialists; and
 symbol 183 \f "Symbol" \s 12 Mecklenburg Neurological Associates.
6. The parties stipulated into evidence as Stipulated Exhibit 3, without need for further authentication or verification, plaintiffs vocational rehabilitation records from Comprehensive Rehabilitation Associates, Inc. consisting of 204 pages.
 *********** ORDER
After the appeal by both parties from the Opinion and Award of Deputy Commissioner Taylor, plaintiff moved for the Industrial Commission to authorize additional medical providers who were involved in plaintiffs stomach reduction surgery and resulting complications pursuant to N.C. Gen. Stat. 97-25. The undersigned hereby DENY plaintiffs motion; therefore, the treatment rendered by the medical providers named by plaintiff is not approved and defendants are not liable for payment of the treatment costs.
 ***********
Based upon all the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 48-year-old female who had obtained her registered nursing degree in 1970. Thereafter, she worked in coronary care at Memorial Mission Hospital until 1977 when she began working for the Sanger Clinic. Plaintiff was the Director of the Pacemaker Clinic and was paid a salary. In the approximately eleven years plaintiff spent working at Sanger Clinic, she followed thousands of patients, having approximately 2,500 pacemaker patients and 350 fibrilator-installed patients. Plaintiff took care of patients wounds, monitored their medication and computer programmed their devices. She regularly worked fourteen to eighteen hours per day and was on call seven days a week, 24 hours a day. This is a job that was generally performed by physicians and not nurses.
2. On 16 April 1993, plaintiff earned an average weekly wage which yielded the maximum compensation rate for the year 1993.
3. On 16 April 1993, while plaintiff was attempting to push a cart holding 600-800 pounds of equipment into the elevator, the wheel jammed in the threshold of the elevator and as plaintiff bent down and dislodged the wheel, she suffered an admittedly compensable injury by accident to her back. Once plaintiff dislodged the wheel, she was unable to stand up and as it was after hours on a Friday evening, plaintiff went home and put heat and ice on her back. Plaintiff initially treated with Hunt Clinic of Chiropractic on 20 April 1993. However, plaintiffs condition eventually worsened and she underwent an MRI of the spine on 27 April 1993, which revealed a herniated disc at L4-5 on the right. On 3 May 1993, plaintiff presented to neurosurgeon Dr. Jerry Petty, with pain in her back down to her right knee, paresthesia into the right foot and numbness of the entire right foot. Plaintiff was diagnosed with a herniated disc at L4-5 on the right side which was compressing the L-5 nerve root and was experiencing complete foot drop on the right side. On 7 May 1993, plaintiff underwent a partial hemilaminectomy at L4-L5 with removal of herniated disc performed by Dr. Petty. Thereafter, while plaintiff was in physical therapy, the therapist raised her leg and plaintiff felt something pop. Her incision had reopened and the linens were bloody. Thereafter, plaintiffs incision became infected. In June 1993, plaintiff was progressing well but by July 1993, plaintiff had experienced a flare up in the pain in the right leg and hip. On 14 July 1993, plaintiff was diagnosed with a recurring disc herniation at L4-5 on the right and a second surgery was performed by Dr. Petty on 9 August 1993 to remove the recurrent disc. The dura was torn and repaired during this procedure with a loss of spinal fluid.
4. Plaintiff never returned to employment with the Sanger Clinic, and they hired three registered nurses to perform her job duties. In late September 1993, Dr. Petty prescribed physical therapy for plaintiff. By 19 October 1993, Dr. Petty thought that plaintiff would be able to return to work in one month. By 5 January 1994, plaintiff was complaining to Dr. Petty of pain in her back and right leg and that her right foot was dragging. On 17 January 1994, an MRI was repeated which disclosed scar tissue on the right at L-5. On 23 February 1994, plaintiff returned experiencing leg pain, and Dr. Petty and plaintiff discussed that it would be a good idea for plaintiff to pursue a formal weight loss program as it could improve her back condition.
5. On 18 January 1994, plaintiff was seen by Dr. Erving Batchelor for a psychological evaluation. Dr. Batchelor found plaintiff to be severely depressed.
6. On 24 January 1994, plaintiff was seen by Dr. Mark Hartman of the Miller Orthopedic Clinic complaining of foot drop and low back pain. In Dr. Hartmans opinion, plaintiffs foot drop was related to her herniated discs at L4-5 level, which were caused by her work-related injury. Dr. Hartman indicated that surgery was not needed but that plaintiff would benefit from rehabilitation.
7. On 26 February 1994, plaintiff was admitted to Presbyterian Hospital into the Adult Behavioral Health Unit. At that time she was seen by Dr. George H. Dornblazer, a psychiatrist, and diagnosed with major depression, post-lumbar surgery times two and obesity. Plaintiff indicated that she was a 45-year-old cardiovascular nurse with two lumbar disc surgeries in the past year, that her boyfriend had experienced a ruptured cerebral aneurysm the previous year and that she had been disabled from work. Plaintiff indicated her depression had increased in the last two months and she had been experiencing loss of sleep with one to two hours of sleep per night and had been crying most of the day. During plaintiffs inpatient treatment, Dr. Dornblazer came to be of the opinion that plaintiffs identity was primarily work-related and that plaintiff had a care-taking personality without clear boundaries and as such her emotional response to her loss of ability to work was typical. Dr. Dornblazer was of the opinion that plaintiffs primary desire was to return to work.
8. Plaintiff was also referred by Dr. Dornblazer to Dr. Joseph Markey, a neurologist and pain medicine specialist. Plaintiff complained of low back pain, depression, headache, and inability to function and right lower extremity pain at times. Dr. Markey felt that plaintiffs disability was a combination of the L5 root syndrome problems and plaintiffs depression. Dr. Markey did not think that plaintiff could return to work at the time but would be able to in the future with treatment for depression and pain. Dr. Markey was of the opinion that plaintiff had L-5 nerve root syndrome which resulted in weakness and difficulty in bringing her foot up, might result in gait or posture problems and could definitely result in falls. Dr. Markey was of the opinion that any falls plaintiff had were more probably than not related to her back injury. Dr. Markey was of the opinion that the drainage incident which plaintiff had with her back during physical therapy and the aggravating episode she had when she was merely trying to sweep her porch and experienced severe pain were often very upsetting to patients. Dr. Markey was also of the opinion that the cause of plaintiffs depression, in large part, was that plaintiffs condition was not improving and that the factors impacting plaintiffs return to work were depression, emotional distress and weight reconditioning.
9. By 2 May 1994, plaintiff indicated to Dr. Dornblazer that things were going pretty well, her boyfriend had moved out and she expressed concerns of her bedroom being upstairs in her house and difficulty in navigating those stairs. On a 10 May 1994 visit to Dr. Petty, plaintiff complained of having trouble getting around because of weakness in the dorsiflexion of her right foot. Plaintiff showed Dr. Petty bruises where she had fallen. Plaintiff completed her rehabilitation program at the Rehab Center on 29 August 1994 and in October 1994, began a program of vocational rehabilitation with Comprehensive Rehabilitation Associates, Inc. Plaintiff updated her resume and applied for many jobs. Positions were recommended by employees of Comprehensive Rehabilitation Associates, but the majority of the applications made by plaintiff were leads discovered by her. Plaintiff sent out her own letters and resumes and followed up on self-generated leads. From late 1994 until June 1995, plaintiff sent resumes and cover letters to over 200 employers, including 80 leads supplied by the vocational specialists and over 120 leads supplied by plaintiff. Plaintiff began work at Nalle Clinic as a Clinical Research Coordinator on June 5, 1995. The position required managing and following various studies of drug or medical device safety and effectiveness. The pay at this job was less than half what she had been making at Sanger Clinic at the time of her injury by accident, and plaintiff was paid temporary partial disability benefits equal to the maximum compensation rate for the year 1993.
10. Dr. Petty reviewed a job description prior to plaintiff beginning work at the Nalle Clinic, and approved the description but noted that plaintiff was to do no lifting or pulling on patients and no lifting over 20 pounds. Nalle Clinic indicated that it was willing to accommodate these restrictions and that they would supply someone to help plaintiff, and she would not have to exceed her restrictions.
11. The reality of plaintiffs job at Nalle Clinic was that she worked independently and was to handle equipment and records which weighed 20 or more pounds on a regular basis, walk long distances, carry ice chests for samples taken from patients, lean down into chest height freezers, carry medical specimens and medications, do patient exams which required bending and stooping on her part, climb small stools or ladders to retrieve notebooks and travel protocol books and carry luggage. Plaintiff was able to perform these duties successfully but it took her longer to perform her duties than others performing similar duties and caused an increase in her symptoms.
12. Plaintiff did not complain to her supervisors at the Nalle Clinic because of her strong desire to continue working. Instead, she placed her materials in a wheelchair and pushed them and drove her car to the hospital instead of taking the long walk through the hallways of the office building.
13. On 17 November 1995, plaintiff was terminated from her employment with Nalle Clinic for reasons unrelated to this claim.
14. Although plaintiff was employed with Nalle Clinic from 5 June 1995 until 17 November 1995, and performed her job duties, the physical demands of the job were beyond her capacity and the performance of the same increased plaintiffs symptoms. Furthermore, plaintiff was beginning to experience increasing falls.
15. Dr. Petty was of the opinion that it would not have been appropriate for plaintiff to lift the TV-VCR which weighed 40 to 50 pounds out of her trunk as she was required to do at the Nalle Clinic job. It would also not have been appropriate for plaintiff to lift the nebulizer-air compressor of 20 to 30 pounds more than once a day as plaintiff was required to do. Dr. Petty was of the opinion that plaintiff should never have reached as low as floor level to store or retrieve specimens in a freezer, that plaintiff would have difficulty helping some patients sit up on the side of the bed and would have trouble hitting patients on the back to help them retrieve sputum samples, that plaintiff would not be able to bend, pick things up and turn as that would be incredibly risky for someone in plaintiffs condition, and that solo travel where plaintiff was required to carry her luggage and other items would not be possible for plaintiff.
16. In March 1995, plaintiff returned to see Dr. Petty and reported additional falls and indicated that she had fallen on her steps as many as nine times. At that time, a new MRI was ordered which showed mild canal stenosis at L2-3 and L3-4 due to bulging of those discs. However, since there was no compression of the nerve root, plaintiffs condition was deemed to be nonsurgical and she was referred to physical therapy.
17. On 8 August 1996, plaintiff reported more frequent falls to Dr. Petty. By 9 April 1997, Dr. Petty was of the opinion that plaintiff should have a chairlift to assist her in navigating the stairs in her house. On 22 August 1997, due to continued problems with pain and problems with falls and foot drop, Dr. Petty prescribed a walker and a raised toilet seat for plaintiff to help prevent falls.
18. On 22 April 1997, on a visit to Dr. Dornblazer, plaintiff was tearful and depressed as she was not able to work and complained of having fallen down more than 80 times and having trouble navigating the steps at her home. At that time, it was Dr. Dornblazers opinion that plaintiffs depression was directly related to her physical impairment and the resulting inability to work.
19. As of 9 June 1997, it was Dr. Dornblazers opinion that a job search would not be reasonable for the plaintiff and that rejection in the course of the job search would make plaintiffs emotional state worse. At that time, plaintiff was experiencing an increase in her depressive symptoms, sleep problems, worsening feelings about herself, appetite disturbances, loss of interest in doing things and loss of energy. It was also Dr. Dornblazers opinion that these emotional problems would probably worsen plaintiffs physical impairment and that improving plaintiffs home so that she could have self sufficiency at home would help plaintiffs psychological condition.
20. Plaintiff continues to experience frequent falls, falling the morning of the hearing while she was preparing to leave her home. Defendant-employer has refused to make any modifications to plaintiffs home to assist her in getting from her house to her car, from the main level of her house to the upper floor to her bedroom and large bathroom and to otherwise navigate around her home.
21. On 11 March 1995, plaintiff fell going out of her garage, hit her head on a steel beam and experienced a mild concussion with acute lumbar muscle spasm. This fall was witnessed by Sue Mills. On 19 April 1997, plaintiff fell, breaking a crown and a lingual bar, which required repair by a dentist. On 15 July 1997, plaintiff injured her right knee by falling and hitting it on concrete. She was evaluated and treated for this by Dr. John Meade of the Miller Clinic. Plaintiff habitually does not go to the emergency room when she experiences these and similar falls as the cost is prohibitive and she is generally instructed to apply treatment which she can do at home.
22. In June 1997, plaintiff was referred by Dr. Petty to Dr. Frederick Pfeiffer for complaints of carpal tunnel syndrome. After nerve conduction studies, it was determined that plaintiff suffered from bilateral carpal tunnel syndrome on the right worst than the left. Dr. Pfeiffer was of the opinion that falling and putting out her hand could result in multiple traumas which could have caused plaintiffs bilateral carpal tunnel syndrome and the use of a cane can cause carpal tunnel syndrome. He was unable to state in plaintiffs case what had caused her bilateral carpal tunnel syndrome; however, he was of the opinion that use of a cane would exacerbate plaintiffs carpal tunnel syndrome.
23. Dr. Petty was of the opinion that plaintiff from a physical standpoint could do very sedentary work for approximately one half a work day if she could sit, move around and walk at will. Plaintiff has not been released from Dr. Pettys care and there is not plan to do so at this time. Dr. Petty has not given plaintiff a disability rating.
24. As defendant-employer refused to provide plaintiff with modification to her home, she employed the services of Mr. Edwin D. Smith, a specialist in rehabilitation technology and assessments for accessibility issues for people with disabilities. Mr. Smith spent approximately six hours on 20 June 1997, with the plaintiff at her home noting that she had difficulty walking around, limited mobility with a lot of pain and experienced difficulty going in and out of the house. Mr. Smith was of the opinion that plaintiff needed the following: a rollator walker with wheels and basket, a scooter for mobility in shopping and leaving the house; a minivan with lift for transportation of the scooter, a left foot accelerator pedal in the vehicle, drawers or pull out baskets at all below counter cabinets in the kitchen, handrail around three sides of the kitchen island, modified sink and cabinet to provide knee space when using sink and cabinets in kitchen, removal of step barrier at existing shower in upstairs bathroom and addition of grab bar to existing shower walls, modification of the jacuzzi-tub, installation of higher toilet fixtures and grab bars at toilets in both upstairs and downstairs bathrooms, raising of outside deck, ramp to front entry of house, modification of garage to have entry, glide chair for use on interior stairway, unmouse modification to computer, trapeze grip for bed access, electric adjustable bed mattress, lumbar supports for chairs and installation of ground floor jacuzzi.
25. Based upon the recommendation of plaintiffs treating physicians, the following modifications and additions to plaintiffs house and the following equipment would be reasonable and necessary to relieve the mobility and functional problems caused by plaintiffs disabilities related to her compensable work-related injury: a rollator walker, drawers or pull out baskets in all below counter cabinets in the kitchen, a handrail around three sides of the kitchen island counter, replacing of the existing toilet fixtures in the upstairs and downstairs bathrooms with higher models and installation of appropriate grab bars at the toilet sites and grab bars at existing shower entrance in upstairs shower, construction of a ramp into the house for ingress and egress, a chair glide to be used in the interior stairway, and a trapeze grip to assist in bed access and lumbar support for plaintiffs chairs.
26. As of 9 June 1997, Dr. Dornblazer was of the opinion that it was not reasonable for plaintiff to begin a job search.
27. Of over 200 job leads pursued by plaintiff, the majority which she found herself, and the job plaintiff attempted at Nalle Clinic, none were suitable in providing an opportunity for her to earn wages reasonably close to those she was earning at the time of her compensable injury by accident and within her physical capabilities.
28. Based on plaintiffs age, education, transferable skills, experience, disability, pre-injury wages and psychological condition, further job search would be futile.
29. Considering plaintiffs education, age, work experience, significant pain, depression, mobility problems and personality factors, in conjunction with the physical limitations imposed upon her by her 16 April 1993 compensable back injury, plaintiff has been and remains incapable of earning wages with defendant-employer or in any other employment since 17 November 1995.
30. Plaintiffs return to work at the Nalle Clinic coincided with a worsening of plaintiffs symptoms including falls and increasing pain. Plaintiff never reached 100% in this job in that she could not perform her duties in an efficient or timely manner as other employees. Although plaintiffs employment with the Nalle Clinic terminated for reasons other than her disability, because of her compensable impairment of her back, resulting pain and problems in mobility and depression, age, job skills and experience, plaintiff has been unable to work for defendant-employer or any other employer since 17 November 1995.
31. Plaintiffs back pain, foot drop and resulting falls, knee problems and depression were caused by or materially aggravated by her 16 April 1993 back injury and resulting pain. Plaintiffs carpal tunnel syndrome has been aggravated by the use of a cane necessitated by her 16 April 1993 compensable injury.
32. As a direct and proximate result of her 16 April 1993 injury by accident, plaintiff suffered injury to her back, resulting in pain, depression, reduced mobility, excessive falling and problems with her knee.
33. Plaintiff has been out of work since 17 November 1995, due to her back injury and the resulting back pain, depression and other complications which were a direct and proximate result of her work-related injury by accident.
34. Plaintiff was unable to engage in physical activities required by her former job or in any other gainful physical activity as a direct and proximate result of her 16 April 1993 compensable injury to her back. As a result of her compensable injury on 16 April 1993, plaintiff was incapable of earning wages with defendant-employer or in any other employment from 17 November 1995 and continuing.
 ***********
The foregoing stipulations and findings of fact engender the following additional:
 CONCLUSIONS OF LAW
1. From 17 November 1995, and thereafter, plaintiff was incapable because of her work-related 16 April 1993 back injury, resulting pain, depression and lack of mobility, to earn wages which she was receiving at the time of her injury at the same or any other employment. N.C. Gen. Stat. 97-29.
2. As a result of plaintiffs admittedly compensable 16 April 1993 back injury, the physical restrictions resulting therefrom, her depression and lack of mobility, along with plaintiffs age and specialized work history, plaintiff is totally and permanently disabled. N.C. Gen. Stat.97-2 (9); N.C. Gen. Stat. 97-29.
3. Plaintiff is entitled to weekly compensation at the maximum compensation rate for the year 1993 at the rate of $442.00 and continuing for the remainder of her life. N.C. Gen. Stat. 97-29.
4. Plaintiff is entitled to have defendant-employer provide all medical treatment arising from this injury by accident to the extent it tends to effect a cure, give relief or lessen her disability, including but not limited to treatment for her back and leg pain, lack of mobility, depression, knee injury caused by her falls, dental problems caused by her falls, aggravation of her carpal tunnel caused by use of a cane and a weight loss program. N.C. Gen. Stat. 97-25; N.C. Gen. Stat. 97-29.
5. Plaintiff is entitled to have defendants provide the following which are medical supplies and treatments which are reasonably required to effect a cure and or give relief to her and or will tend to lessen the period of her disability: a rollator walker, drawers or pull out baskets in all below counter cabinets in the kitchen, a handrail around three sides of the kitchen island counter, replacing of the existing toilet fixtures in the upstairs and downstairs bathrooms with higher models and installation of appropriate grab bars at the toilet sites and grab bars at existing shower entrance in upstairs shower, construction of a ramp into the house for ingress and egress, a chair glide to be used in the interior stairway, and a trapeze grip to assist in bed access and lumbar support for plaintiffs chairs. N.C. Gen. Stat. 97-2 (19).
6. Defendant-employers defense of this claim was not unreasonable. N.C. Gen. Stat. 97-18.
 ***********
The foregoing stipulations, findings of fact and conclusions of law engender the following:
 AWARD
1. Defendant-employer shall pay temporary total disability compensation to plaintiff at the rate of $442.00 per week for the period from 17 November 1995, through and including the present. This compensation has accrued and shall be paid in a lump sum, subject to a reasonable attorneys fee approved in Paragraph 3.
2. Defendant-employers shall pay plaintiff permanent total disability compensation at the rate $442.00 per week continuing for the remainder of her life subject to a change of condition pursuant to N.C. Gen. Stat.97-47. This compensation shall be paid subject to a reasonable attorneys fee approved in Paragraph 3.
3. A reasonable attorneys fee of 25% of the compensation due plaintiff is approved for plaintiffs counsel and shall be paid as follows: 25% of the lump sum due plaintiff under Paragraph 1, and thereafter, every fourth compensation check shall be deducted from the sum due plaintiff and paid directly to plaintiffs counsel.
4. To the extent the same is reasonably designed to effect a cure, give relief or lessen the period of disability, defendants shall pay all medical expenses incurred by plaintiff as a result of her compensable injury, including but not limited to continued medical care for plaintiffs back, depression, knee condition, the dental bills incurred by plaintiff as a result of her fall, medical treatment required by plaintiff due to the exacerbation of her carpal tunnel syndrome caused by use of a cane, a weight loss program, as well as the following modifications to plaintiffs home: a rollator walker, drawers or pull out baskets in all below counter cabinets in the kitchen, a handrail around three sides of the kitchen island counter, replacing of the existing toilet fixtures in the upstairs and downstairs bathrooms with higher models and installation of appropriate grab bars at the toilet sites and grab bars at existing shower entrance in upstairs shower, construction of a ramp into the house for ingress and egress, a chair glide to be used in the interior stairway, and a trapeze grip to assist in bed access and lumbar support for plaintiffs chairs.
5. Defendants shall bear the costs.
This the ___ day of September, 1999.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER